```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
——————————————————————————————

Samuel H. Sloan,                    **15 CV 6963**

                         Plaintiff,

                                   **Affidavit in Opposition**
                                   **to Motions to Dismiss**

              -against-

Michael Michel, Jose Miguel Araujo, Ronald Castorina Jr.,
John Flateau, Maria R. Guastella, Michael A. Rendino, Alan
Schulkin, Simon Shamoun, Gregory C. Soumas, Michael J.
Ryan, Bianka Perez, Steven Howard Richman, Jerry H.
Goldfeder, Stanley Kalmon Schlein, Venancio Benny Catala,
Daniel Szalkiewicz, Stephen Edward Kitzinger, Douglas
Arthur Kellner, Kimberly Galvin, Kathleen O'Keefe, Board of
Elections in the City of New York, New York State Board of
Elections,

                         Defendants

——————————————————————————————

**Affidavit in Opposition to Motions to Dismiss**

——————————————————————————————

The plaintiff Samuel H. Sloan being duly sworn, deposes and
says:

     1. I am the plaintiff in the above entitled action. I
make this affidavit in opposition to the various motions to
dismiss filed by or on behalf of the defendants.

     2. In summary I will easily prove that several of the

1

defendants including especially Steve Richman, Kathleen O'Keefe, Stanley Kalmon Schlein, Daniel Szalkiewicz, and to an lesser extent Stephen Edward Kitzinger have committed major felony crimes including violations of election law by submitting false, fraudulent and altered documents to the boards of elections and to the courts so as to get the candidates they favor elected unopposed and the candidates they oppose thrown off the ballot. If these defendants are jailed they will at least be back with their friends, the many New York City and State elected officials who are already in jail serving time or are awaiting sentencing for state and federal crimes pertaining to elections.

3. I present as Exhibit A the first 15 pages of one of the many petitions filed by Stanley Kalmon Schlein for candidates in the recent election. I need to explain that I spent months trying to get copies of these petitions. The Board of Elections in the Bronx refused to let me see much less copy these petitions. This came up at the last hearing before this court by which time I had made a Freedom of Information Law or FOIL request. I finally got to see and

2

copy these petitions one week ago. However, as there are at least 100 petition sheets for each of the 12 districts, it was not feasible to copy all 1200 pages so I just copied the first 15 pages which are a representative sample. Also, the original petitions are on oversized green colored 8.5 x 18 inches paper and the copy machine used by the Board of Elections is only 8.5 x 14 and my scanner is only 8.5 x 11, so the copies I am submitting as exhibits has seven inches cut off the top. Thus it will be difficult to see the point I am making but if I am allowed to produce these actual petitions in court using the subpoena power I will be able easily to show how and why these documents are fraudulent and have been tampered with.

4. I believe that the reason Stanley Kalmon Schlein uses oversized specially made 8.5 x 18 paper for his petitions is because no copy machine can copy paper that large and no scanner can scan paper that large so this is one of the dirty tricks Stanley Schlein uses to prevent objections being made to knock his candidates off the ballot. He also uses a remote hard to find address in the

Bronx as his supposed residence for service.

5. If you will look at page two of Exhibit A (page one being just a cover sheet) you will see near the top the scanned page the name of Ruby Stephens, address 1210 Boynton Avenue, Bronx NY 10472. However, if you look carefully you will see a slightly different tint in the background behind both the name and the address of Ruby Stephens. From this copy, you will not be able to see the reason for this change in tint but when and if I am allowed to subpoena these documents and have them produced in court and if you are able to feel the document, you will be able to see and feel that a sticker has been placed on the document and the original name on the document which was the name of some other candidate was covered up by this sticker and the name and address of Ruby Stephens was placed over the name, what ever name it was, of the original candidate.

6. So obviously this petition sheet is invalid because any kind of altering of a petition by whiteout, by or stickers or by any other means invalidates the entire sheet

4

just as if you put whiteout or a sticker on a bank check
invalidates the entire check. Thus it is not only the name
of Ruby Stephens that is invalidated by this sticker but
the signatures for all of the names on this petition page
are invalidated.

    7. It is not only this one name on this one petition
sheet that is invalidated but on all or almost all of the
more than 100 sheets in each of the 12 districts filed by
Stanley Kalmon Schlein these kind of stickers are on them.
If you will look carefully at every page of the 15 pages I
am submitting as Exhibit A you will see they all contain
these type stickers. These are just typical examples of the
approximately 1200 pages that contain these stickers which
are so clear and carefully placed as to be nearly
invisible. Since all of the candidates submitted by Stanley
Kalmon Schlein had these type of stickers on their
petitions and since these candidates were all candidates
for judge or judicial delegate, this means that every one
of the new judges who took ten year terms of office in the
Bronx just this new year got into office by means of

fraudulently tampered with election petitions !!!

8. It is not reasonable or realistic to expect for the judges of the New York State Courts to throw out these election petitions, because all of the state court judges were elected by this same fraudulent process. No judge elected by fraud is going to find or admit that his own election was fraudulent. Thus, the only chance to win this case or a case like this is through the federal courts.

9. I was actually told this by Judge Wooten of the Manhattan Supreme Court when I had this case before him. After the hearing was over and the opposing counsel had all left the courtroom and only he and I were still there, Judge Wooten said, "You are never going to win this case in state court. You are wasting your time here. The only way to win your case is to file in federal court. You need to file this case over there", he said pointing.

10. It can be seen by playing the youtube video at the hearing on July 28 https://www.youtube.com/watch?v=S_Qlw-G0lOc (and I suggest that you play it several times), that Mr. Stanley Schlein repeatedly interrupts the commissioners

while they are speaking and fights with Steve Richman over several issues. Every time Commissioner Umane is saying something in my favor, and there are several instances of this, Stanley Schlein interrupts him and does not allow him to continue.

11. Most importantly, when the board is being polled to see whether these candidates get on the ballot or not, Stanley Schlein interrupts and we cannot hear the vote.

12. At 55:50 on the video Steve Richman arrives at this case where the clients represented by Stanley Schlein had initially been thrown off the ballot by the CRU for reasons including that the petitions were modified with stickers after the signatures had been collected. Here Steve Richman General Counsel for the Board of Elections makes a long five minute speech where he says that while many of these petitions do contain stickers, but the objector, Egidio Sementelli (the same person who is on the vacancy committee in the case before this court) does not allege "with particularity" how these stickers were attached to the petitions and thus the objections to them

7

were invalid. This statement by General Counsel to the
Board of Elections lasts for five minutes from 55:50 until
1:00:35 on the video and Steve Richman hands up a brief or
counsel report to the Commissioners stating that all six of
the objections by Sementilli should be disallowed for some
technical reason such as "this is essentially an allegation
of fraud and the board will not normally rule on an
allegation of fraud" and these candidates should go on the
ballot. At no time at the hearing are the actual petitions
handed up to the board for examination unlike the normal
practice before this board where the actual petitions are
present in the hearing room and in a contested case such as
this one the Commissioners examine the physical petitions.

13. Here it is obvious that the board is showing
favoritism to Mr. Schlein and his candidates as when a
sticker is attached to a petition with no way to determine
whether the sticker was attached before or after the
witness signed it is obviously invalid. Steve Richman's
statement that the Board would not normally rule on this
type of allegation is simply not true. It is just plain

8

common sense that the stickers that were attached changing
the addresses of the candidates must have been attached
after the petitions were signed because otherwise the
petitions would simply have been reprinted with the correct
names and addresses on them. Thus the petitions submitted
by Stanley Kalmon Schlein were obviously invalid and yet
the board passed them.

14. Now when it comes to the petitions with my name on
them just as Steve Richman goes to extreme lengths to rule
that the obviously invalid petitions submitted by Stanley
Kalmon Schlein should pass Richman goes to great lengths to
throw the candidates on the petitions with Sloan's name on
them off the ballot even though there is nothing wrong with
the "Sloan petitions". He states that the cover sheets were
attached to the petitions (which indeed is the requirement
of state law) and the petition sheets were not sequentially
numbered, which is not true because they were sequentially
numbered. I was informed by Troy Johnson head of the CRU or
"Candidates Record Unit" that the "Sloan candidates" had
been thrown off the ballot by July 12 which was 16 days

before the hearing on July 28 "for failure to respond to the non-compliance notice". I asked the CRU for a copy of the non-compliance notice and they said they did not have it. I repeatedly and persistently asked for this non-compliance notice visiting the Board of Elections many times until after the hearing on July 28. I found out that Steve Richman is not in charge of the CRU. The CRU does not work for Steve Richman and he is not their boss although he often talks and acts like he is their boss. I eventually found out that by the time this case was in court that there were three different non-compliance notices each saying something different. I still today have not found out which notices were sent out, by whom they were sent out, when they were sent out and to whom they were sent. I can state that they were not sent to me as I have not received any of them and I still do not have a copy of any of them. Also, Mr. Egidio Sementilli who was on the vacancy committee where I was a candidate did not receive one nor did the head of the vacancy committee receive one. In addition and most importantly the Candidate Record Unit or

10

CRU does not have any record of a non-compliance notice being sent out. Thus it is apparent that it must have been Steve Richman himself who sent out this non-compliance notice and he must have sent it to the homeless shelter on Jerome Avenue where Millie Quinones was residing in a large woman's dormitory facility with two hundred beds and even had she received it she would not have known what to do with it.

15. When and if a hearing is held on this matter I will produce via subpoena the actual petitions with my name on them and it will be shown that there was nothing wrong with them. I got to see them myself for the first time last week pursuant to the same FOIL request and was able to observe that there was nothing wrong with the petitions or the cover sheet. I was a candidate and according to that authoritative work "Goldfeder's Modern Election Law" authored by Jerry Goldfeder one of the defendants in this case, a candidate should not be in any way involved in circulating the petitions or collecting and submitting them to the Board of Elections. In addition I was in Marin

County California on another legal matter during the entire petitioning period and I never got to see the actual petitions and they were not produced nor available at the hearing or in court so I never got to see them before.

16. Another thing about the petitions in Exhibit A is that all of them are perfect. Every box is neatly filled out. Every signature is clear and legible. There are no cross-outs or erasures. Nobody wrote across the lines. Nobody wrote in the wrong box or out of a box. When the petitioner went to a building, everybody in the building signed. Everybody was at home to sign. Nobody was away at work, or in the hospital or just did not like the candidate and did not want to sign.

17. Anybody with experience petitioning and collecting signatures will know that this never happens. Many people sign with illegible signatures. Many give the wrong address. Many sign with addresses in another city or state or in another borough on New York City. Experienced petitioners know that if somebody gives a bad signature or a wrong address do not argue with or correct the person

12

signing. Just move on to the next person. Some signers will just scribble something illegible or write Mickey Mouse who is a resident in the apartment just to get rid of you.

18. Perfect petition sheets such as those submitted by Stanley Kalmon Schlein will never happen in the real world. Thus I suspect fraud in the collection and submission of these signatures.

19. Attached as Exhibit B are just 6 pages of petition sheets with my name on them submitted by Millie Quinones. There were more than 500 pages of these petition sheets but again I am just submitting 6 pages as a representative sample. Here you can see examples of the subject petition. Notice there are cross-outs and erasures like one will find on any real petition.

20. Exhibit C is the first 20 pages of the objections file by the objector for Stanley Kalmon Schlein against the petition of Egidio Sementilli. Again I am just submitting the first 20 pages not the hundred pages of the actual objection. Here the actual objection is done in the correct and proper way. It is a line by line objection showing the

exact page and line number containing a signature to which
there is an objection and the nature of the objection by
code. At the bottom of each sheet is a tabulation of how
many signatures are on the sheet, how many valid and how
many invalid. This is the way it is supposed to be done.

21. Exhibit D is the so-called "Specific Objection"
filed by Stanley Kalmon Schlein against me. As you will see
it is only three pages long although the actual petitions
submitted with my name on them were 400 pages long. In
short, this is not a specific objection at all. For this
reason the CRU ruled that no specific objections had been
filed as to my candidacy and the other candidates on the
list that included me.

22. This is a serious problem with the Candidates
Record Unit or CRU. They time and date stamp everything
that comes in. However, they do not keep a record of what
they send out and when and where they sent it. I have been
to their office at 32 Broadway 7th floor many many times
asking about this. They cannot tell me what non-compliance
notices were sent and when and by whom they were sent and

to whom they were sent. When I went there and asked about this they could not provide an answer. Their rules state that the non-compliance notice is to be sent "to the contact person or to the head of the vacancy committee". One problem is the word "or". They did not know and could not state whether it was sent to the head of the vacancy committee Mr. Soto or to the contact person Miss Quinones. In either case, it was not sent to any of the 12 candidates including me. Should not the candidates who are the persons most affected by this receive these notices? As will be seen, when my objector objected to the petitions of Congressman Serrano, the objections were sent to Jerry Goldfeder who was both the contact person and the attorney for Congressman Serrano and who admitted to receiving them. There, the board said that I was required to serve the candidate personally on the same day that the objections were filed even though it was impossible to do so because on that day Congressman Serrano was in Washington DC appearing before a Congressional committee on Internet security. This is one reason why I am suing both Jerry

Goldfeder and Board of Elections then President Gregory C. Soumas because at the hearing before the board when Jerry Goldfeder started to speak on this issue President Soumas interrupted him and told him not to say anything. Since Congressman Serrano did not have enough signatures to get on the ballot, President Soumas was protecting Jerry Goldfeder and Congressman Serrano from having to answer questions about this issue. As a result, Congressman Serrano was re-elected to the US Congress. Had President Soumas not protected Congressman Serrano then I Sam Sloan would have been elected unopposed because in the Bronx the Democrats always win and the Republican Party for practical purposes does not exist in the Bronx and does not seriously contest these elections.

23. Now you see that my objectors objection to the petitions of Congressman Serrano was dis-allowed on the ground that I had not served the candidate personally on that day (although he was served the following day) even though the contact person Jerry Goldfeder was served, yet in the 2015 year case I the candidate was not served nor

16

were any of the other 11 candidates served and we still do not know who if anybody else was served, yet we were all knocked off the ballot.

24. Looking at the latest declaration by the board, they have changed their story. Here is what it says on page 9

> "These defects were presented to the duly appointed Commissioners' Cover Sheet Review Committee (the "Committee") at their meeting held on July 9, 2015. The Committee unanimously confirmed the staff's recommendations and directed that Notices of Non-Compliance be issued to the designated contact person, Millie Quinones."

25. Millie Quinones was and is a homeless person then living in a homeless shelter on Jerome Avenue with about 200 other residents in a dormitory setting. This just about guaranteed that she would never get the notice. More importantly, the last day to file was MIDNIGHT on July 9, 2015. Yet, the entire slate of 12 candidates was thrown off the ballot in the early afternoon on July 9 while the petitioning was still taking place.

26. The Cover Sheet Committee just consisted of two new and inexperienced commissioners and Steve Richman

17

General Counsel who stated that this petition had been submitted by Mr. Sloan who has given us trouble before. In fact, I had not submitted the petition and I was not even in the state when the petition was drafted and circulated. I was in California.

27. I found out that I had been thrown off the ballot by a youtube video which is here: 7-9-15 Coversheet Review https://www.youtube.com/watch?v=Inc-fqTl-lA It starts at 13:09 and continues at 14:20

28. Steve Richman is leafing through pages of the 300 plus page petition at 15:11 and ends at 17:40. It is obvious here that Steve Richman is not doing a cover sheet review. He is doing a general search of the petition. This is not allowed. His compatriot even says at one point on the video there is no problem with the cover sheet. It is with the content of the petition.

29. Steve Richman says at 15:45 "The person who filed this is Mr. Sam Sloan has a habit of litigating against the board on the ground that we usually discriminate against him and that we single him out for special treatment".

18

Actually, I did not file the petition. I was not even in New York. I was just one of the candidates on the list. The fact that he keeps mentioning my name shows the prejudicial attitude of the board against me.

30. It is difficult to see but take a close look at the second group of candidates. All of them are a slightly different color. This is because they were all on a sticker. All the names and addresses of the candidates had been changed. This obviously invalidated the entire petition and since almost all of the petitions were like this, all of the petitions were invalid. The opponents objected to all of this but Steve Richman overruled these objections and all of these petitions were passed and all of these candidates were elected. Since these candidates were all judges or judicial delegates this means that every judge that has taken office in Bronx County this year has won his seat by virtue of a fraud.

31. The brief by the board also states that the Commissioners of Election are appointed by the City Council. This is not true. The Commissioners are appointed

by the party bosses who are not elected officials. The Chairman of the Republican Party in each Borough appoints one commissioner and the Chairmen of the Democratic party in each borough appoints one Commissioner. This is obviously unconstitutional because this means that the Democratic Party bosses are the ultimate authority to decide who gets on the ballot. For example, here the insider group in the Bronx led by Stanley Kalmon Schlein who is obviously being paid by the Bronx County Committee received approval by the Democratic Commissioners whereas the outsider not approved group of non-approved candidates including me got thrown off the ballot.

32. In the 2015 case involving Jerry Goldfeder and Congressman Serrano I was asked to run because Congressman Serrano is an extreme left-winger that some might call him a Communist and is opposed to the economic development plan advocated by the Bronx Borough President Reuben Diaz Jr. Congressman Serrano is very far to the left and is rated as further to the left than Bernie Sanders and his only other issue is independence for Puerto Rico, so the regulars who

20

circulate petitions for Democratic Party candidates were
unwilling to circulate petitions for him and as a result he
did not have enough signatures.

33. The petitions filed by Congressman Serrano were
filled with obviously false and in some cases fraudulent
signatures. Many of his subscribing witnesses are not
registered to vote including Javier Lopez, Stephen Castillo
and Dave McKay. There are also many cases of completely
illegible signature, completely different signature, no
signature at all, signature does not match the signature on
the buff care and a few obvious forgeries.

34. For these reasons, his petitions should have been
thrown out as permeated with fraud, in addition to having
an insufficient number of signatures.

35. With great difficulty I had to make copies of the
buff cards of all of the witness to Serrano's petitions and
I matched them with the witnesses on the petitions. This
was difficult to so because as part of the fraud they had
shuffled and mixed up the petitions so that petitions filed
by the same witness did not appear together and the clerks

21

checking these petitions upon finding one where the witness was not registered to vote would not realize that there were many by the same witness scattered throughout the petition sheets.

36. Another suspicious circumstance was that in every case on all of Serrano's petitions the signature of the witness bears the exact same date as the signature of the signer of the petition and there are no cross-outs, erasures or corrections. Anybody who does petitioning knows that in real life real signers often fill in the boxes wrong or in the wrong place or cross out their names and petitioners usually carry these petitions for several days or weeks and do not witness them until they bring them into the office to get paid.

37. Many of the signatures were in the same handwriting. All were from the same buildings but with no apartment number. In all likelihood, the petitioner just copied the names off the wall.

38. The Board of Elections refused to look at and consider these specific objections saying that they are

22

moot in that the Specific Objector did not serve
Congressman Serrano on the same day that they were filed.
However, there is no statutory law saying that the Specific
Objections must be served on the same day that they are
filed. This is just a rule of the Board of Elections in the
City of New York. Other boards such as the boards in
Nassau, Suffolk and Westchester Counties have different
rules. The rule is clearly unfair and unreasonable as
applied in this case as Congressman Serrano was in
Washington DC on that date of April 16, 2014 attending a
Congressional Committee meeting and thus could not be
served on New York State on that date. He was served the
next day and thus there was no fraud.

39. The Board of Elections is making up its own Ad
Hoc Rules as it goes along. It ruled that I was not allowed
to speak at the hearing on April 24, 2014 because I am not
an attorney at law, even though I was the candidate. There
is no such rule. Nobody has ever heard of a rule like that.
At these hearings, in the past everyone has been allowed to
speak.

40. As another example, another candidate for Congress Yolanda Garcia who was seeking to run in the 13th Congressional District had specific objections filed against her. The CRU ruled that the specific objections violated prima facie Rule H11 their rules in four different ways including no objection number, no binding and cover sheet not attached. Nevertheless, the Board of Elections overruled these four violations of their rules and is allowing these specific objections to proceed. This shows that the Board of Elections is acting unfairly and is biased.

41. There was a special problem in this case because Congressman Jose E. Serrano who is regularly in Washington DC or in Virginia where he actually resides is not to be found in New York State. His apartment across the street from the Bronx Supreme Court Building does not have anybody actually living there.

42. 2014 was unusual in that having lost the primary for US Congress there was still time to run for state office, so I was asked to run for governor. Sam Sloan ran

24

on a slate as a Democratic candidate for Governor of New York State, Nenad Bach as Candidate for Lieutenant Governor of New York State, Geeta Rankoth as Candidate for Comptroller of New York State and Neil V. Grimaldi as Candidate for Attorney General of New York State in the Democratic Primary to be held on September 9, 2014.

43. Incorporating herein as evidence is the youtube video of these proceedings linked at http://www.elections.ny.gov/2014Meetings.html which shows that they clearly violate the due process clause of the 14th amendment.

44. It is clear from this video that it was not on the calender to remove these candidates from the ballot and these names were not on the list of names read by Commissioner Kellner of candidates to be removed from the ballot for reason of objections.

45. These candidates were required to be given notice as to the sufficiency and quality of their signatures. This was not done as there was never any objections of specifications filed against Sam Sloan or Nenad Bach and

required by NY election law 16-102 and 6-154 which states "the written objection to such petition may be filed within three days after the filing of such party certificate or the making of such party nomination. When such an objection is filed, specifications of the grounds of the objections shall be filed within six days thereafter with the same officer or board and if specifications are not timely filed, the objection shall be null and void."

46. The video illustrates that there was no witness at the hearing as requited by NY state evidence law as to the insufficiency of the petitions. The Board of Elections never even reviewed the petitions. On July 8, 2014, four volumes of petitions were filed nominating Sam Sloan as a Democratic candidate for Governor of New York State, Nenad Bach as Candidate for Lieutenant Governor of New York State, Geeta Rankoth as Candidate for Comptroller of New York State and Neil V. Grimaldi as Candidate for Attorney General of New York State in the Democratic Primary to be held on September 9, 2014. These petitions have four volumes. Volume 1 starts with page One and ends with page

807. Volume 2 starts with page 1 and ends with page 659. Volume 3 starts on page 1 and ends on page 1197. Volume 4 starts on page 1 and ends on page 1402. Thus there are 807 + 659+ 1197 + 1402 or a total of 4065 page numbers on the petition.

47. These petitions were marked valid as appeared on the Board of Elections website at http://www.elections.ny.gov:8080/reports/rwservlet?cmdkey=whofiled

48. However, on August 4, 2014, nearly one month later, the Board of Elections changed them from valid to invalid. Board of Elections did not have a right to review of the petitions because they had the appearance of validity and there were no specific objections.

49. The so-called specific objections filed against Geeta Rankoth and Neil Grimaldi were not sufficiently specific in that they were not line-by-line objections and lacked the specificity necessary to review them. Although the objection to Rankoth said that she did not have enough signatures, it did not state how many signatures she had

27

and how many are required. As a result, the Board of
Elections did NOT throw these candidates off because of
objections and they were not on the list of candidates read
by Commissioner Kellner at the meeting on August 1, 2014
who were thrown off because of objections. Rather, Sloan,
Bach, Rankoth and Grimaldi were thrown off the ballot at
the oral request of Kimberley Galvin, the Republican Party
Counsel on the Board of Elections.

50. Here Kathleen O'Keefe has earned herself a place
on my defendants list and my recommendation that she spend
several years in federal prison through a massive fraud
upon the courts because she submitted into evidence a short
stack of about 140 pages of white 8.5 x 11 copy paper
claiming that these were the petitions filed by the Sloan
candidates and they could not possibly contain 15,000
signatures at ten signature per page. In reality the actual
petitions on behalf of the Sloan candidates was more than
four thousand pages of 8.5 x 14 green cardstock more than a
foot high and there were easily enough pages and enough
signatures to qualify.

51. It is well established that under the law of the State of New York including Section 16-102 of Election Law if a candidate files facially valid petitions and there are no objections filed then the candidate goes on the ballot. There are specific rules about objections in Section 6-154 such as that General Objections must be filed within three days and Specific Objections must be filed within six days more.

52. Here there were no objections filed as to the candidacies of SAM SLOAN, as Candidate for Governor of the State of New York and NENAD BACH as Candidate for Lieutenant Governor of the State of New York. The rule based on Section 16-102 of New York Election Law is that if there are no objections to a candidate, his name remains on the ballot. Thus the New York Board of Elections had no jurisdiction to remove Sam Sloan and Nenad Bach from the ballot.

53. However, there were two identical objections filed as to GEETA RANKOTH as Candidate for Comptroller of the State of New York. Both were identical using even the same

printer and font. Those two objections were based in part
on the mistaken belief that she was not enrolled in the
Democratic Party. She was in fact enrolled in the
Democratic Party but the enrollment lists are generally
three to four weeks out of date and her name had not yet
appeared on the lists. She had enrolled just after turning
age 18. There was also an objection as to her age, as the
statutory requirement for Comptroller is age 30 and she had
not reached that age. There was also a generalized
objection as to the number of signatures she had submitted.
That objection stated stated in full, "a. The nominating
petition fails to contain the minimum number of signatures
required by the NYS Election Law for nomination for the
public office of Comptroller of the State of New York."

54. This is all it said. There was nothing more.
However, the Appellate Division Third Department wrote,
"Objections were filed with regard to the candidacy of
Rankoth and asserted, among other things, that the petition
contained fewer than one third of the 15,000 signatures
required for any of the four candidacies (see Election Law

6-136 [1]).”

55. As you can see, this was not correct neither factually as a statement of law. Neither of the two objectors said that the petition of Geeta Rankoth contained fewer than one-third of 15,000 signatures. They merely stated that they contained less than the required number of signatures, which could be 14,999 signatures for example.

56. State law does NOT say that the petitions must contain 15,000 signatures. It actually says the petition “must be signed by not less than fifteen thousand or five per centum, whichever is less, of the then enrolled voters of the party in the state (excluding voters in inactive status)”. We do not know how many enrolled voters there are in the party and how many are on inactive status. This requires a mathematical calculation. It is not up to us nor up to the Board of Elections to make this calculation. In a small party such as the Working Families Party, only a few hundred signatures may be enough to get on the statewide ballot.

57. What has happened here is without any objections

being filed, neither specific nor general, the staff of the
Board of Elections apparently decided to count the
signatures. They claim that any time anybody claims that
there are not enough signatures, they must start counting
the signatures. However, that cannot be the rule because if
it was the rule then everybody would claim that their
opponent did not have enough signatures, putting the staff
of the State Board of Elections to the task of counting all
the signatures. The attorney for the Board of Elections,
Kathleen O'Keefe, at the hearing before Judge Ceresia, said
that any time an objector alleges that there is an
insufficient number of signatures, then the Board of
Elections must count the signatures and determine their
validity. However, this is not the rule. The rule is  a
candidate cannot be kicked off the ballot for insufficient
signatures unless someone has objected to the number of
signatures. There are a number of cases that support this.
The rule is the Objector must count the signatures and
inform the board of elections how many signatures there
are. Then the Candidate can do his own count and the matter

32

will be resolved at a hearing. In any event the Board of
Elections never does any counting. If it were otherwise,
then every objector would routinely allege that the number
of signatures is insufficient, requiring the Board of
Elections and the tax payers to do all the work.

58. In the case presented here in court, the Board of
Elections filed no opposition papers. Nothing in writing.
This led the judge to make several silly errors. He stated,
"In This regard, it is noted that even the most cursory
facial review of the designating petitions clearly reveals
that they could not possibly contain the necessary 15,000
signatures. That is the last numbered page of the submitted
designating petitions is 1402 and each page allotted for no
more than 10 signatures. Thus even with 1402 pages with ten
signatures on each page would fall approximately 1000 pages
short of what was needed."

59. However, he obviously never looked at the
petitions and neither did the Appellate Division because
while Volume 4 does contain 1402 pages, there is also
volumes 1, 2 and 3. The judge, Andrew G. Ceresia, and the

lawyer for the Board of Elections obviously never looked at

the petitions because otherwise they would not have made

such a stupid remark. The petition has four volumes

    Volume 1 starts with page One and ends with page 807
    Volume 2 starts with page 1 and ends with page 659
    Volume 3 starts on page 1 and ends on page 1197
    Volume 4 starts on page 1 and ends on page 1402
    Thus there were 807 + 659+ 1197 + 1402 or a total of
4065 page numbers on the petition.

    60. Here counsel for the Board of Elections engaged in

several ethical violations by not informing the judge and

the Appellate Division of his mistake and also tampering

with the evidence. Counsel for the Board of Elections did

not submit the actual petitions to the court. Instead, she

submitted what she said were "true and correct" copies.

However, they were not true nor were they correct. The

original petitions were on thick green petitioning paper

8.5 x 14 and card stock. What she submitted to the court

instead was minaturized copies on ultra-thin copy paper.

Then she used the small size of what she submitted to make

it seem obvious that there were not enough signatures.

    61. The following cross examination took place on

pages 27-28 the transcript:

34

```
1.   (Sam Sloan - Cross by Ms. O'Keefe)
2.
3.   Q Mr. Sloan, are you aware of how many sheets of
4.   paper are in a ream of paper? Are you aware of
how many are
5.   in a ream? You buy paper, copy paper in reams?
6.   A I suppose there is 500. I don't know.
7.   Q That's right. And four thousand pages would be
how
8.   many reams?
9.   A I guess simple multiplication. It would be
eight.
10.  Q It would be eight. Does that stack of pages
look
11.  like it's eight reams of paper?
12.  A I'm not an expert on paper size.
```

62. It can be seen that she is basing her argument on the size of the stack of paper. The Board of Elections calls this "the weight test". If it appears that the size of the petitions weighs enough, they are not going to inquire further. Here counsel for the Board of Elections did not put the actual petitions on the table. She put minaturized petitions on the table, using copy paper of excessively low bond, not even normal copy paper. Neither the Commissioners of the Board of Elections nor the judge of the Supreme Court saw the actual petitions. The difference was the stack of paper submitted to the court by counsel for the Board of Elections was less than four

inches high whereas the actual green petitions are over a foot high.

63. Petitioners counsel made a motion TO SET ASIDE EVIDENCE SUBMITTED BY RESPONDENTS. (See page 36 of the Record) The judge denied the motion, saying that counsel had failed to object to their admission in the proper time and manner. However, the reason counsel did not do so was he had no way to know that the copies of the petitions submitted were vastly different from the originals. Neither the candidates nor their counsel had ever seen the original petitions. It was only hours after the hearing before Judge Ceresia was over and petitioners and counsel were driving back to New York City, that calls were made and counsel found out that the original petitions were submitted on green 8.5 x 14 petitioning paper and card stock, not on the ultra-thin 8.5 x 11 white paper used to make the copies.

64. At the time of oral argument before the Appellate Division of the Third Department, counsel for the Board of Elections said that she had given the actual petitions to the appellate court at their request. However, we never

were able to get to see what she had showed them. In any

event that was irrelevant because the court of original

jurisdiction had never seen the real petitions and had he

seen the real petitions there can be no doubt that he would

have changed his decision if only to rewrite it because his

original decision as written is ridiculous. Since then we

have tried to get access to the original petitions but they

cannot be found. I indent to subpoena the original

petitions for the hearing before this court and they will

clearly show that there are or could be 15,000 signatures

there.

　　65. Counsel for the Board of Elections made a number

of statements about what the Commissioners of the Board of

Elections decided. None of these statements are true. For

example she said:

　　　　13. With respect to that particular candidate, the
　　　　14. Board received time specific and general
　　　　objections from
　　　　15. two different objectors. And when the Board met
　　　　on
　　　　16. August 1st the Board voted in public, and they
　　　　are on
　　　　17. a video that's available on YouTube, because
　　　　they do
　　　　18. have their meetings in public, with respect to

that
19. candidate, that she did not meet both the signature
20. requirements, as well as the age requirement, and they
21. held her Petition invalid. (See transcript Page 14 in the Record page 54)

66. She claimed that these statements can be found on youtube. However, none of these statements are on youtube. You need to play the youtube.com video of the meeting on the New York State Board of Elections on August 1, 2014

https://www.youtube.com/watch?v=Soq_8m36RZ0

67. The important part of the video regarding Sam Sloan, Nanad Bach, Geeta Rakoth and Neil Grimaldi starts at 6:20 and goes on about 20 seconds. There an attorney for the Republican Party, Kimberly Galvin, says she has an addendum to the motion to the board by having Sam Sloan, Nanad Bach, Geeta Rakoth and Neil Grimaldi removed from the ballot. No member of the board mentions those names. Nothing is said by any member of the Board about Geeta Rankoth or anybody else not having enough signatures. No mention is made by anybody about the age requirement to run for Comptroller.

68. Geeta Rankoth herself had written to the Board
stating the following: "I wish to add that it is a
violation of federal law to discriminate against me because
of my age. Specifically it violates the Age Discrimination
in Employment Act of 1967 and other state and federal
laws." Neither the Board of Elections nor the Supreme Court
nor the Appellate Division were informed of this letter or
this issue.

69. By doing a search on youtube.com for "NYSBOE –
08.01.2014" one can find the actual video of the meeting.
Ms. Kathleen O'Keefe is shown on the video. She was there
although she said nothing. Next to her is a man with white
hair Bob Brehm, Co-Executive Director. What the video shows
is Commissioner Kellner moves to start the agenda with
section 4a and then reads off from a sheet of paper a list
of 14 candidates and slates who are bring thrown off
because of objections. After he finishes reading the list,
the Republican Party attorney Kimberly Galvin interrupts by
saying that she has an addendum of four names of people she
wants thrown off the ballot. She attempts to hand up a

39

sheet with the names but is told to read it instead. Those names are Sam Sloan, Nanad Bach, Geeta Rankoth and Neil Grimaldi.

70. Commissioner Kellner then goes on to read a list of names of candidates who failed to file acceptances and are being thrown off for that reason.

71. After concluding these lists, Commissioner Kellner states, "We need to make a motion to adopt the Prima Facia list as reported in writing and as I just read."

72. This is followed by "So Moved" and "Passed".

73. However, the names of Sam Sloan, Nanad Bach, Geeta Rankoth and Neil Grimaldi were not on the lists "just read" by Commissioner Kellner. Those four names were only mentioned orally by Kimberly Galvin, who is not a member of the board. Neither Commissioner Kellner nor any of the other Commissioners mentioned those names. Therefore, Sam Sloan, Nanad Bach, Geeta Rankoth and Neil Grimaldi were not legally thrown off the ballot.

74. The judge made another mistake which the Appellate Division adopted when he wrote:

"The present proceeding is jurisdictionally

defective due to the "failure to name and serve all

those who filed objections to the designating

petition".

75. However, that only applies if there were

objections to a candidate and the candidate was thrown off

because of the objections. Here the candidate was claimed

to have been thrown off as a prima facie matter, not

because of the objections and there were no objections as

to Sloan and there were only general objections, niot

specific objections to the other candidates.

76. ELECTION LAW § 6-154 states:

3. When a determination is made that a certificate or
petition is insufficient, such officer or board shall give
notice of the determination forthwith by mail to each
candidate named in the petition or certificate, and, if the
determination is made upon specified objections, the
objector shall be notified.

77. Here, if Geeta Rankoth was thrown off because of

Objections, then the Board was required to notify her and

the Objectors "forthwith", BEFORE the meeting of August 1,

2014, to give her time to respond and be heard. However,

the Board did not notify Geeta or the objectors because

41

Geeta was not thrown off because of Objections. Since Geeta was not thrown off because of Objections and since the Objectors were not notified, there was no obligation to sue the objectors.

78. In addition, the "Specific Objections" filed against Geeta Rankoth were facially invalid because they were not line by line objections and were not specific enough. A specific objection to the number of signatures is required to state how many signatures there are and how many are required. The rule is the Objector must count the signatures and inform the board of elections how many signatures there are. Then the Candidate can do his own count and the matter will be resolved at a hearing. In any event the Board of Elections never does any counting. This one sentence specific objection in this case does neither.

79. Had these Specific Objections been filed with the New York City Board of Elections rather than the New York State Board of Elections, they would have been ruled invalid for not being specific enough. This case shows the big differences between the New York City Board of

Elections and the New York State Board of Elections, even though they are administered under the same statute. Had this case happened under the New York City Board of Elections, the outcome would have been completely different. Sam Sloan and Nenad Bach would have automatically gotten on the ballot as there were no objections to them. As to Geeta Rankoth, in the absence of line-by-line objections it is not clear what the board would have done but assuming it went to a hearing there would have been a clerk's report following a hearing before the full board in which she would have had an opportunity to defend her petitions.

80. Before these cases I had previous run-ins with the Board of Elections. In 2004 I decided to run as a Republican against Townes for US Congress in the 10th Congressional District in Brooklyn where I was living at the time. As I was a registered blank, I needed a Wilson-Pakula. I appeared at the convention of the Brooklyn Republican Party with Aaron Maslow as the chairman. Maslow and I did not know each other at the time. I was approved

by unanimous vote of the convention as no Republican wanted
to run in such a hopeless race and the Wilson-Pakula was
granted and the documents signed by Maslow. About a week
later, Diane Rudiano Chief Clerk of the Brooklyn Board of
Elections, read my website and discovered that I was a
vehement critic of George W. Bush. In the Democratic Party
one can be a vehement critic of Hillary Clinton and still
be allowed to run for election, but in the Republican Party
it appears that one must be a fervent supporter of George
W. Bush to be allowed to run as a Republican.

81. As a result, Diane Rudiano informed Aaron Maslow
of my anti-Bush diatribes and my Wilson-Pakula was revoked.
They started looking around for somebody to take my place
to run for Congress but nobody could be found.

82. Meanwhile, I was out collecting signatures and
discovered that Diane Rudiano lived only four blocks from
my residence in East New York, Brooklyn, a ghetto area. I
naturally went to her house to collect her signature. I was
told that nobody matching her description had ever been
there. I described her as a middle-aged overweight white

44

lady who drives a big fancy Lincoln which I had seen her drive. The neighbors told me that no middle-aged white lady had ever been there. There was a one hundred year old white lady living there but she was the only white person living in the entire neighborhood.

83. Since the law states that the Chief Clerk of the Brooklyn Board of Elections must live in Brooklyn and it was clear that she did not live at the address that she had provided as her address in registering to vote, I made a complaint against her to the relevant agency on Maiden Lane. The person in charge of these investigations, a man from England with a cockney accent, probably selected because he had no political ties to any candidate or party, quickly established that I was right. Diane Rudiano did not live in Brooklyn at all. She owned two apartment buildings in Flushing Queens and lived in one of them. After spending months completing his investigation, he filed a case against Diane Rudiano.

84. It was here that I found out how corrupt New York City Politics is because here the Chief Clerk of the

45

Brooklyn Board of Elections had committed a major felony by using a fake address for her own voter registration in order to get the job as chief clerk to which she was not entitled but the Brooklyn District Attorney and all the members of the Board of Elections were politically tied to her so the charges against her were almost immediately dismissed and she was reinstated as Chief Clerk and she holds that position to this day.

85. This incident was reported in the major press only once in the Brooklyn edition only of the New York Daily News. However, Erik Engquist, a political reporter for a series of small neighborhood newspapers throughout Brooklyn published a series of weekly articles about this, without any effect. This incident convinced me that for any outsider non-approved candidate to try to run for election in New York City was a waste of time. Too bad I had forgotten about this when I was convinced to run 9 years later.

86. So I forgot about running for election for the next nine years until 2013. Then in 2013 I was asked to run

a slate of candidates as Republicans because in 2004
following the above incident I had changed my voter
registration from blank to Republican. They asked me to run
this slate because I was the only one who had any money
(from my book publishing business). I ran Sam Sloan as a
candidate for Mayor of the City of New York, Richard
Bozulich as a candidate for Comptroller of the City of New
York and Thomas R. Stevens is a candidate for Public
Advocate of the City of New York.

87. Thomas R. Stevens was in a unique situation
because he was the only Republican Party candidate seeking
to be elected as Public Advocate. He was also a long time
Republican Party political activist having been for many
years the Chairman of the Young Republicans of New York.
Thomas R. Stevens previously served as acting Republican
State Committeeman for the 25th Assembly District, as Law
Committee Chair of the Queens County Republican Party, as
President of the New York Young Republican Club, as
President of the Federation of New York State Young
Republican Clubs, and as founder of Red Republicans,

47

Liberty Republicans and the Susan B. Anthony Republicans. He also worked in support of the Presidential Campaigns of Ronald Reagan, Steve Forbes and Dr. Ron Paul. If he got on the ballot there would be no Republican Party Primary for Public Advocate and Stevens would go straight onto the November General Election ballot as the Republican Party candidate. On the other hand, if he was not allowed to run, the Republicans would have no candidate of their own to vote for.

88. At some time after 11:00 PM but before 12:00 PM on the last day to file specific objections, Daniel Szalkiewicz filed specific objections on behalf of a previously unknown person named Caruso. It was immediately obvious that this one signature was a forgery. There can be no doubt that Daniel Szalkiewicz did in fact forge the signature of Caruso and that by this forgery he was able to throw three candidates including Stevens off the November Ballot. The forgery is obvious. Here is the supposed signature of Caruso on the Specific Objections:

is are attached.

_Objector's Signature_

89. **Now here is the signature of Caruso on the buff card:**

90. **Now here is the signature on the general objection:**

_Objector's Signature_

91. **It is plainly obvious that the signatures of Caruso on the buff card and the general objection are similar but the signature of Caruso on the specific objection is completely different. The fact that there is some similarity between the S for Salvador on the buff card with the S for Salvador on the Specific Objection shows that the forger was trying to make a convincing forgery but was not doing a good job of it. The fact that the forgery is so completely obvious shows that the Board of Elections is also part of this conspiracy because with this one**

49

forgery being used to throw three candidates off the ballot for city-wide office.

92. This was because the Republicans did not have any candidates for Comptroller or Public Advocate other than my candidates because the Republicans never win. This means that my two candidates who are long standing advocates for the Republican Party were cheated out of the opportunity to get their names on the November Ballot.

93. On July 31, 2013, all three of these petitioners were thrown off the ballot after a hearing by the New York City Board of Elections. Caruso did not appear at the hearing nor did he appear at the subsequent case before the New York Supreme Court or at the New York Appellate Division First Department. Nobody has ever seen this Caruso except for presumably Szalkiewicz.

94. At the Hearing on the Order to Show Cause before Justice Wooten on August 5, 2013, Defendant Board of Elections in the City of New York provided only one grounds for throwing the petitioners of the ballot. That ground was that under Section 132 (2) of New York Election law the

subscribing witnesses to a Designating Petition must be registered to vote as a member of the Party whose nomination is being sought, and the subscribing witnesses were not Republicans with only one exception.

95. This was because of a case Aaron Maslow had brought. This is the same Aaron Maslow who had granted me a Wilson-Pakula in 2004 and then revoked it one week later at the request of Diane Rudiano, Chief Clerk of the Brooklyn Board of Elections. The courts had declared the subscribing witness rule unconstitutional in Kaloshi v. New York City Board of Elections, 02 CV 4762, 2002 WL 31051530 (E.D.N.Y. Sept. 6, 2002). However, Aaron had tried to expand on by filing a case for a declaratory judgment stating that he could run for election as a Republican while his wife who was a registered Democrat collected signatures for him. This case should likely been thrown out for lack of standing as Maslow had never and still has never run for election but instead the courts entertained it and it backfired giving the opposite result from what Maslow wanted. See Maslow v. Board of Elections in City of N.Y.,

658 F.3d 291 (2d Cir. 2011)

See Also N.Y. State Board of Elections v. Lopez-Torres, 552

U.S. 196, 128 S.Ct. 791, 798, 169 L.Ed.2d 665 (2008),

Credico v. New York State Board of Elections, 751 F.Supp.

2d 417, 423 (E.D.N.Y. 2010)

Dekom vs. New York, 12-CV-1318 (JS)(ARL)

Lerman v. Board of Elections of N.Y.C., 232 F.3d 135, 145
(2d Cir. 2000).

96. In view of the obvious forgery by Daniel

Szalkiewicz which resulted in three otherwise qualified

candidates being thrown off the ballot, Plaintiff has filed

complaints with the Disciplinary Conduct Committee and the

NY Attorney Generals Office and will continue to do so

until Szalkiewicz is finally jailed. If and when a hearing

is held before this court, Plaintiff will seek to subpoena

the buff cards and the specific and general objections

filed with the Board of Elections and will attempt to

subpoena Caruso if he can be found.

97. The mystery of who is paying Daniel Szalkiewicz to

perform his dirty deeds and why an unknown person named

Caruso would file specific objections against Sloan has

been answered by the discovery that Caruso is the next door
neighbor to John Greaney, the new chairman of the Bronx
Republican Party. Greaney became Chairman of the Bronx
Republican Party after his predecessor Jay Savino was
indicted and later convicted of being involved in the
payment of a $15,000 cash bribe to secure a Wilson-Pakula
for a Democratic Party member who wanted to run for Mayor
of New York City as a Republican and to secure the
appointment to the Board of Elections of a favored person.

98. Plaintiff actually met John Greaney just three
weeks ago at a Christmas Party for the Bronx Republican
Party located at 3029 Middletown Rd, Bronx, NY 10461. I was
shocked to see a member of the staff of the CRU or
Candidates Record Unit attending the Christmas Party of the
Bronx Republican Party and sharing drinks with them. Upon
being introduced to me, Sam Sloan, John Greaney said, "You
have cost us a lot of fucking money".

99. This statement by John Greaney obviously refers to
the big money they have paid to Daniel Szalkiewicz first to
forge the signature of Caruso and then to defend against

all the proceedings plaintiff has brought and will continue to bring to have Daniel Szalkiewicz put in jail among other things. Since John Greaney and The Bronx Republican Party are paying for this, they are obviously complicit in this forgery. If Daniel Szalkiewicz were completely innocent he would not ask John Greaney and the Republican Party to pay for his defense.

100. These payments that are being made to attorneys to knock candidates in their own party off the ballot are or should be required to be disclosed. Thus, the "legal fees" being paid to the attorneys here Jerry H. Goldfeder, Stanley Kalmon Schlein, Daniel Szalkiewicz, Stephen Edward Kitzinger, Douglas Arthur Kellner, Kimberly Galvin, Kathleen O'Keefe, and Steven Howard Richman, should be required to be disclosed under Campaign Finance Law. It is unlikely they are doing their nefarious deeds as a public charity. They belong in jail. Accordingly I am demanding that the payments be disclosed in this case.

101. This issue came up before Judge Wooten when I demanded to know who was paying Daniel Szalkiewicz. The

transcript shows that when the Plaintiff objected to the

fact that Salvatore Caruso was obviously a front man and

the attorney appearing should be required to disclose who

the real clients and objectors were, the court responded as

follows (See Transcript Pages 2-3):

> MR. SLOAN:    But one thing I do object to is it's
> obvious that Mr. Caruso is a front man and I would
> like to know who's paying Mr. Szalkiewicz's legal
> fees because he's obviously got some others behind
> him who are doing this.
>
> THE COURT:    That's a request by you, sir?
>
> MR. SLOAN:    Yes, it is.
>
> THE COURT:    Your application is denied.  We've
> never done that.  In 30 years on the bench we've
> never, never -- I'm sorry.  In five years on the
> bench and 27 years as an election law attorney,
> we've never had a case where that application's been
> granted.  You have an exception, sir.

    102. Why would the Republicans send a hit-man like

Szalkiewicz to throw the only Republican Party Candidate

off the ballot? The answer is obviously leadership control.

The Republican Party Leadership wants to make sure that

only they select the candidates and that nobody not

anointed by the leadership can run as a Republican Party

Candidate.

103. Who is this Republican Party "Leadership"? Why, it is none other than disaffected Democrats. The Chairman of the Bronx Republican Party is now John M. Greaney who was anointed Chairman by the previous Chairman Jay Savino after Savino was arrested by the FBI in April 2013 in a bribery scam. Speaking from his jail cell, Savino refused to step down unless he got to name his successor, who turned out to be John M. Greaney. Yet, Greaney was a registered Democrat until recently, when he switched his party registration to Republican.

104. There is a video available on youtube showing the actual payment of a $15,000 cash bribe. The attorney receiving the bribe tells the paying person that in case any question comes up about this payment he will sent a legal bill for legal services rendered to explain the payment of this $15,000.

105. I am surprised at the small amount of money involved. I spent more than $50,000 of my own personal money, not donations or campaign contributions, but in

hard-earned money from my business of reprinting out-of-print books, to run for election in 2013-2015 without getting on the ballot. If I had known that all I had to do was pay a bribe of $15,000 to get on the ballot I would gladly have done so and saved a lot of money by doing so. I did not realize that hit-men like Daniel Szalkiewicz work cheaper than they used to.

106. Another question concerns the question of whether knocking an opposition candidate off the ballot constitutes "legal work". How does the "work" that Stanley Kalmon Schlein, Daniel Szalkiewicz, Stephen Edward Kitzinger, Douglas Arthur Kellner, Kimberly Galvin, Kathleen O'Keefe and Jerry H. Goldfeder perform, which just consists of knocking opposition candidates off the ballot, thereby depriving the voters of the opportunity to vote for a candidate and chose the person they want for higher office, constitute "legal work"?

107. This is especially the case of Stanley Kalmon Schlein, whose almost entire "legal practice" consists of knocking opposing candidates off the ballot. Stanley

Schlein is known as being the most powerful power broker in
New York if not the USA. He has advised important people
like the Clintons and has been instrumental in getting them
elected by having all their opponents ruled off the ballot.
The New York Times says about him, "For years he has been a
vital cog in the Bronx Democratic machine, defending
incumbents and knocking insurgents from the ballot in the
merciless tradition of city politics." See The New York
Times for July 26, 2005 "Bronx Lawyer Is a Power Behind
Several Thrones". If Hillary Clinton needs Stanley Schlein
to get on the ballot and to make sure there are no opposing
candidates, he is a powerful person indeed.

WHEREFORE, for all of the reasons set forth above, the
motions to dismiss should be denied and these matters
should be set down for a fact hearing and

WHEEFORE the defendants should required to disclose
the names of who they really work for, how much they are
paid and by whom and what are their duties, the things they
are supposed to do in return for these payments and

WHEREFORE the Plaintiff should be allowed to subpoena

58

and have available for discovery and at the hearing all of the petitions, objections and other documents pertaining to the subject elections including especially the petitions pertaining to the 2015 elections for judges and judicial delegates.

**Samuel H. Sloan**
**1664 Davidson Avenue, Apt. 1B**
**Bronx NY 10453**

**917-507-7226**
**917-659-3397**
**samhsloan@gmail.com**

Sworn to before me this
8th day of January 2016

CUI YING LI
Notary Public, State of New York
No. 01LI6303092
Qualified in New York County
Commission Expires May 12, 2016

Notary Public

59

STATE OF NEW YORK :
                  :  SS:
COUNTY OF NEW YORK:

## VERIFICATION

Sam Sloan, being duly sworn, deposes and says that he is the plaintiff herein, that he has read the foregoing petition and knows the contents thereof that the same is true as to his own knowledge except as to those matters alleged upon information and belief and as to those matters he believes it to be true.

_____

Sam Sloan

Sworn to before me this 8th

day of January 2016

NOTARY PUBLIC          CUI YING LI
                       Notary Public, State of New York
                       No. 01LI6303092
                       Qualified in New York County
                       Commission Expires May 12, 20__

60